208 So.2d 297 (1968)
Eugene J. PANOZ, Appellant,
v.
GULF AND BAY CORPORATION OF SARASOTA, Appellee.
No. 67-374.
District Court of Appeal of Florida. Second District.
March 15, 1968.
Rehearing Denied April 11, 1968.
*298 Charles J. Cheves, Jr., of Icard, Merrill, Cullis & Timm, Sarasota, for appellant.
David S. Yost, of Paderewski, Cramer, Robinson, Ginsburg & Ross, Sarasota, for appellee.
PIERCE, Judge.
This is an appeal by Eugene J. Panoz, plaintiff below, from a judgment non obstante veredicto entered upon motion of Gulf and Bay Corporation of Sarasota, defendant below, after trial and verdict for plaintiff in a case involving alleged negligence of defendant in the operation of its golf course.
The basic facts of the case as derived from the pleadings and evidence at trial were substantially as follows: that defendant owned and operated a public "par three" golf course on Siesta Key in Sarasota County, which course Panoz had "played" some eight or nine times prior to March 19, 1964; that wooden benches for the convenience of the passing players had been placed on the various tees and it was well known that such benches were, from time to time, moved around on or near the tees by golfers; that on March 19, 1964, plaintiff was playing the course with a young teen-ager named Spencer and as they approached the sixth tee they had to wait a couple of minutes for preceding golfers to clear the sixth fairway and green, so plaintiff sat down on the bench so provided and presently toppled over to the rear, causing his head and back to strike the ground; that the bench was about eight feet long, twenty inches high, the seating portion eleven and one half inches wide, with three legs about nine inches wide with inverted V's cut at the bottom, i.e., the usual type benches in public places. Panoz and Spencer are not in exact agreement as to how long Panoz had been sitting on the bench before he fell over, or as to whether the bench was sitting all on the tee terrain or all on a slight slope off the tee or partly on both, but such is immaterial to our determination.
Plaintiff's suit to recover for injuries received in falling contends negligence on the part of defendant because of (1) "poor design" *299 of the bench, (2) allowing "placement" of the bench on an uneven turf thereby creating a "dangerous condition", and (3) failing to warn plaintiff of such condition which "should have been known" to defendant. Defendant by answer denied any negligence, and upon trial the jury returned verdict in favor of plaintiff and awarded $6,000 damages. Ruling on a motion by defendant for directed verdict during the trial had been deferred, and after verdict defendant filed motion for judgment n.o.v., which was granted by the Court, and judgment was thereupon entered for defendant. Plaintiff has appealed and assigns as error the setting aside of the verdict and entering the final judgment for defendant. We affirm.
We are cognizant of the rule that "a stronger showing is required to reverse an order granting a new trial than one denying it", and we have so held in several cases which presuppose an area of factual conflict. Brown v. Fawcett Publications, Inc., Fla.App., 1967, 196 So.2d 465; Grant v. Williams, Fla.App., 1966, 190 So.2d 23, and Florida Power Corporation v. Smith [and Fleming], Fla.App., 1967, 202 So.2d 872. But especially is the rule applicable in a case where the Court goes beyond ordering a new trial and proceeds directly to final judgment, in which event the action of the Court is likened to granting a motion for directed verdict for defendant at the conclusion of testimony at trial. And in such cases we have held that judgments n.o.v. cannot be entered "unless the evidence as a whole with all reasonable deductions to be drawn therefrom, points to but one possible conclusion". Barr v. Mizrahi, Fla.App., 1960, 124 So.2d 508; Aucompaugh v. City of Punta Gorda, Fla.App., 1966, 181 So.2d 713.
However, under the facts developed at the trial here, we think the trial Judge would have been warranted in directing a verdict against the plaintiff. Therefore, the trial Court was within its right, having deferred ruling upon such motion, in setting aside the verdict after trial and entering judgment n.o.v. Ramadan v. Crowell, Fla.App., 1966, 192 So.2d 525; Morgan v. Collier County Motors, Inc., Fla.App., 1966, 193 So.2d 35. The party so moving shoulders a heavy burden because he necessarily "admits all material facts as attested by his adversary and also admits all inferences of fact favorable to the adversary that reasonably might be drawn from the evidence as a whole". Cash v. Gates, Fla. App., 1963, 151 So.2d 838; Love v. Adams, Fla.App., 1967, 194 So.2d 55.
Applying the foregoing principles to the case sub judice, and admitting we would so hold only in a clear case, we are constrained to the view that plaintiff's "side of the case is essentially devoid of probative evidence". Love v. Adams, supra; Ely v. Atlantic Coast Line R.R. Co., Fla.App., 1962, 138 So.2d 521.
At the outset, it is essential that we determine and fix the degree of care imposed by law upon defendant as the owner and operator of a public golf course in maintaining its playing premises so as to reasonably protect its invitee patrons from injury. Plaintiff, while conceding that defendant was "not the insurer of plaintiff's safety" urges that nevertheless defendant is the owner and operator "of a place of amusement" and was therefore charged with a higher degree of diligence than required of "stores, banks, and other places of business", citing Turlington v. Tampa Electric Company, 1911, 62 Fla. 398, 56 So. 696, 38 L.R.A.,N.S., 72; Mosqueda v. Paramount Enterprises, Inc., Fla.App., 1959, 111 So.2d 63; Wells v. Palm Beach Kennel Club, 1948, 160 Fla. 502, 35 So.2d 720; Rainbow Enterprises v. Thompson, Fla., 1955, 81 So.2d 208, 55 A.L.R.2d 861; and Mertz v. Krueger, Fla., 1952, 58 So.2d 160.
We do not agree that defendant's enterprise was a "place of amusement", as we ordinarily understand the term, nor that the standard of care involved in the operation of the instant golf course should be *300 necessarily governed by or aligned with that laid down in the cited cases.
In Turlington, decided in 1911, a patron was maimed and subsequently died from injuries resulting from diving off a springboard into shallow waters at the old Ballast Point Pavilion and bathhouse then operated by Tampa Electric Company at the end of a street railroad line, where there was no sign warning the public of the danger of shallow water at that particular spot.
In Mosqueda the patron suffered personal injuries at an indoor theatre, when a chair, located in the ladies' lounge of the theatre, collapsed when she sat upon it.
In Wells the patron suffered severe injuries when she fell to the floor after stepping on an empty bottle in the aisle of the grandstand at a dog track.
In Rainbow Enterprises a patron suffered injuries when she tripped and fell down a third flight of stairs leading from the restaurant building to the boathouse at Rainbow Gardens near Dunnellon, the fall occurring "when the heel of her shoe caught in a depression variously described as a `hole', a `crevice', or a `concave surface' about six inches long and about one inch deep at the center".
In Mertz a patron was injured when she fell a distance of about ten feet to the rocks below, from a bulkhead extending along the beach line of a gulf front beach cottage project where there was no light, guard rail, fence, or other warning along the bulkhead.
In those cases, the injuries occurred in an obviously dangerous place where a large number of paying patrons were congregated in a relatively limited area. In such instance, the danger was either patent, in which case the operator was under a duty to remove or overcome the obvious danger, or it was latent, in which case the operator was under a duty, if it could not be reasonably eliminated, to at least advise or suitably warn the invitee public of the unseen danger.
Here, we have a materially different situation. A modern golf course is not a compact building or complex of buildings or structures, as we currently understand the term. Rather than being a "place of amusement", as traditionally categorized by the Courts, it covers a vast expanse of land with a minimum of structural facilities. The purposeful objective is not primarily "entertainment" but rather recreation, relaxation and exercise, and the patron himself is one of the participants in the project. The proprietor or owner of a golf course cannot be reasonably expected to police the entire area of the course at all times, at least to the "higher degree of care" imposed upon "the places of amusement" involved in the cited cases, any more than he could be reasonably expected to protect his patrons with that "higher degree of care" from being struck by a golf ball driven by an erratic fellow golfer or by a golf club thrown by an irate fellow golfer.
This is not to say that the golf course owner has no legal duty to protect his patrons from all dangers encountered from conditions under his control, while they are "touring the course". It is to say that the operator owes only the duty to exercise due care and to take such precautions as are ordinarily necessary to keep the golf premises in reasonably safe condition for his playing patrons during the time they are on the course.
We are, of course, excepting from this discussion injuries which might be incurred by a patron while using the facilities of the central clubhouse building usually located on the golf course premises, especially that portion popularly known as "the 19th hole". Logically, a higher degree of care would be reasonably imposed in the area of the clubhouse building where a larger number of patrons congregate in a more limited area and where the owner has more adequate means of providing care and maintenance.
As to the bench itself, it did not break or collapse. There was no evidence of any *301 hidden or latent defect in its construction or design; nor was there any patent defect. One of defendant's benches, stipulated between the parties to be of the same construction as the one in question, was introduced in evidence, and it showed to be solid, sturdy and substantial with no apparent or observable defect. Plaintiff had full opportunity to observe the bench, its structure and design, before he sat down upon it. Indeed he had presumably done so, having played the course numerous times in the past.
The record is uncertain as to just where the bench was actually positioned at the time plaintiff fell backwards on it  whether on the tee or the slight slope or a part of both. No evidence was presented as to who moved the bench there or how long it had been in that position. The tee itself was anything but smooth, as shown by the photograph in evidence. There is evidence that that particular tee had been occupied a few minutes before because the reason plaintiff sat down on the bench was to wait for golfers to leave the green which he was waiting to drive toward. Plaintiff could not have been hurried in sitting down because he had to wait for the golfers ahead, so he had ample opportunity to observe the bench and its position on the terrain before he sat down. To paraphrase the Supreme Court in Connolly v. Sebeco, Inc., Fla., 1956, 89 So.2d 482, 
"Plaintiff is obviously on the horns of a dilemma  either there was no negligence in maintaining the [bench] or he was guilty of contributory negligence in using [it]."
Assuming arguendo the bench was either fully or partially on the slope of the tee, there was no scintilla of evidence that any employee or person in authority of defendant corporation knew of such position or as to how long the bench had been so placed, so as to charge defendant with such knowledge and thereby to create any duty to give warning. Such position would certainly not have been a permanent placement or one usually contemplated by defendant in its usage.
As the Supreme Court said in Earley v. Morrison Cafeteria Co. of Orlando, Fla., 1952, 61 So.2d 477:
"The law does not require a proprietor of a public place to maintain his premises in such condition that an accident could not possibly happen to a customer. Plaintiff was in turn obligated to exercise a reasonable degree of care for [his] own safety. * * * The duty which the plaintiff owes to [himself] is to observe the obvious and apparent condition of the premises."
In our view an operator of a public golf course such as here involved is not to be considered an insurer of the physical safety of the patrons using the course facilities nor is he required to maintain the course or the facilities in such condition that no accident could possibly happen to a patron, but he does have a legal duty to maintain the course and facilities in a reasonably safe condition commensurate with the attendant facts and circumstances such as an ordinarily prudent person would generally exercise. Clyde Bar, Inc. v. McClamma, 1943, 152 Fla. 118, 10 So.2d 916; Fred Howland, Inc. v. Morris, 1940, 143 Fla. 189, 196 So. 472, 128 A.L.R. 1013; Burdine's, Inc. v. McConnell, 1941, 146 Fla. 512, 1 So.2d 462; J.G. Christopher Co. v. Russell, 1912, 63 Fla. 191, 58 So. 45; Earley v. Morrison Cafeteria Co. of Orlando, supra; Sparks v. Ober, Fla.App., 1966, 192 So.2d 81; Frederich's Market, Inc. v. Knox, Fla., 1953, 66 So.2d 251; and 65 C.J.S. Negligence § 63(121), p. 888, § 63(17), p. 880.
As this 2nd District Court and also the 3rd District Court said in the two "monkey bar" cases, Elmore v. Sones, Fla.App., 1962, 140 So.2d 59, and Hillman v. Greater Miami Hebrew Academy, Fla., 1954 72 So.2d 668, respectively, "no amount of superintendence would have prevented the accident".
Singularly enough, we have found only two reported cases involving alleged negligence *302 in the operation of a golf course, Gillespie v. Chevy Chase Golf Club, 1960, 187 Cal. App.2d 52, 9 Cal. Rptr. 437 and Oliver v. Oakwood Country Club, Mo., 1951, 245 S.W.2d 37.
In Gillespie, a patron was injured when a golf cart, in which he was riding on a public golf course, overturned. The cart was owned by the operator of the course and rented to the patron, who was not propelling it when the accident happened. There was also evidence that the cart struck a "chuckhole" which was defined as "a deep hole in a wagon rut". A verdict against the operator was, as here, vacated by the trial Judge and judgment entered for the operator. The appellate Court affirmed, holding that the operator had only "a duty toward his customers to maintain the course in a reasonably safe condition", and that there "was no evidence that he failed in that duty".
In Oliver, a Country Club regularly employed caddies to serve the patrons of its golf course and had a designated place on the course premises for such caddies to wait their turn for service. A thirteen year old boy was injured by being shot in the eye from an air pump gun by another caddy, employed by the Club, who had the gun with the presumed knowledge and permission of the Club. At trial the Court directed a verdict for the Club and the appellate Court affirmed, holding that the Club's "occupancy of the premises charged upon it the affirmative duty to exercise ordinary care to keep its premises reasonably safe for invitees thereon", such as the injured boy, but that the facts aforesaid showed no liability.
While the particular facts there do not exactly parallel the facts here, the standard of care imposed upon a golf course proprietor, as laid down in the cited cases, does parallel our holding here.
The final judgment appealed from is therefore 
Affirmed.
ALLEN, Acting C.J., and RAWLS, JOHN S., Associate Judge, concur.